

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00143-CV

_____

IN THE INTEREST OF R.W. AND G.W., CHILDREN

On Appeal from County Court at Law No. 1
Parker County, Texas
Trial Court No. CIV-21-0342

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant L.A. (Mother) and Appellant D.W. (Father) appeal the trial court's order terminating their respective parental rights to R.W. and G.W. (the children). In seven issues, Mother contends that the evidence is legally and factually insufficient[1] to support the termination of her parental rights to the children under Family Code Subsections 161.001(b)(1)(D), (E), (N), (O), and (P), that she was denied her right to a jury trial due to ineffective assistance of counsel and trial-court error, and that the trial court erred in overruling her motion for extension of the dismissal date. Father similarly contends that the evidence is legally and factually insufficient to support the termination of his parental rights to R.W. under Family Code Subsections 161.001(b)(1)(D), (E), (N), (O), and (P) and that he received ineffective assistance of counsel because his trial counsel failed to advise Father of his right to a jury trial and to request a jury trial on Father's behalf. Father also argues that the trial court erred by terminating Father's parental rights to G.W. under Section 161.002 of the Family Code and by admitting evidence of Father's drug test results through a witness that was not properly qualified.

As to Mother's and Father's respective issues related to termination under Family Code Section 161.001(b), we will hold that the evidence was legally and

---

[1]Mother's issues on appeal appear to challenge only the factual sufficiency of the evidence. However, her argument incorporates both factual- and legal-sufficiency standards, and she combines her discussion of Family Code Subsections 161.001(b)(1)(D) and (E). In the interest of justice, we will review the evidence under both legal- and factual-sufficiency standards.

factually sufficient to support the termination of Mother's parental rights to the children and of Father's parental rights to R.W. under Subsections 161.001(b)(1)(D) and (E). We will sustain Father's issue related to the termination of his parental rights to G.W. and hold that the trial court erred by terminating Father's parental rights under Family Code Section 161.002 and that the error was harmful, but we will affirm the trial court's conservatorship appointment. With respect to Mother's complaint of ineffective assistance of counsel, we will hold that Mother failed to prove that she was prejudiced by her trial counsel's representation. With respect to Father's complaint of ineffective assistance of counsel, we will hold that Father failed to prove that his trial counsel's representation was deficient. We will thus overrule Mother's and Father's respective ineffective assistance of counsel claims. On Father's issue related to the admission of evidence of Father's drug test results, we will hold that the evidence was cumulative and was therefore harmless. On Mother's issue related to her motion for extension, we will hold that the trial court did not abuse its discretion by denying Mother's motion. Accordingly, we affirm in part and reverse and remand in part for a new trial.

## I. Background

The Texas Department of Family and Protective Services (TDFPS) began investigating Mother and Father after receiving several reports involving domestic violence and drug abuse in the home and physical abuse. In May 2021 alone, Child Protective Services (CPS) received several reports involving Mother and Father. The

children were ultimately removed in May 2021; R.W. was approximately twenty-one months old and G.W. was less than one month old. After a bench trial, the trial court signed its order terminating Mother's and Father's parental rights to the children and appointing TDFPS permanent managing conservator of the children.

## A. The Children's Removal and G.W.'s Fractured Ribs

On May 9, 2021, CPS immediately responded to a new report because G.W. had sustained four rib fractures and was taken to the hospital in an ambulance. When CPS investigator, Latasha Koku, arrived at the hospital, the only family member there was paternal grandmother—Mother and Father were not present. Koku tried to call both parents but was able to reach only maternal grandmother, who provided excuses for why Mother could not be at the hospital with the injured child.[2] Regarding how the child's ribs had been fractured, paternal grandmother indicated to Koku that Mother had thrown G.W. in his car seat. After Koku spoke with G.W.'s doctors at the hospital, she became concerned that G.W. had previously sustained similar injuries. Amber Maloney, a TDFPS investigation supervisor on the children's case, also expressed concerns related to the cause of G.W.'s rib fractures, stating that they likely would not have happened from being thrown in a car seat or even during childbirth.

---

[2]Mother testified that she had been at a behavioral health hospital when she was notified that G.W. was in the hospital. When asked why Mother did not go to the hospital to be with G.W., Mother testified that she was afraid of "not really knowing everything that happened."

Specifically, she was concerned that G.W.'s injuries were not accidental but were trauma induced.

At trial, Father testified that the children had been in paternal grandmother's care[3] and that he had not seen the children in the two days before G.W. went to the hospital. According to Father, G.W.'s ribs had been fractured while he was in the care of paternal grandmother. Father claimed that paternal grandmother had instructed Father to blame Mother for G.W.'s injuries.

Mother's testimony does not align with Father's version of events. Mother testified that on May 9, 2021—the day G.W. was taken to the hospital—Mother and Father were at paternal grandmother's house with the children and had gotten into an argument with paternal grandmother. Sometime around noon, they left the children with paternal grandmother, and Mother claimed that both children were in good condition when Mother and Father left paternal grandmother's house. Mother testified that when she fed G.W. and changed his diaper earlier that day, he did not show any discomfort or pain and did not have any bruises or other injuries. But later that day, G.W. was in the hospital with rib fractures that were already in the process of healing.

---

[3]Mother and Father often left the children with paternal grandmother and paternal grandmother's boyfriend, E.W. Mother and Father both testified that E.W. was physically abusive, that he had sexually assaulted Mother and Father, and that he had threatened Mother and Father. Father also alleged that there had been domestic violence between paternal grandmother and E.W.

After investigating the incident, TDFPS determined that the children needed to be brought into TDFPS care. Maloney testified that regardless of who had inflicted G.W.'s injuries, TDFPS would have been concerned about Mother's and Father's failure to protect the children. Moreover, even discounting G.W.'s fractured ribs, TDFPS still would have sought removal.

**B. Evidence of Domestic Violence**

TDFPS initially became involved with Mother and Father because the children had been exposed to domestic violence in the home. Less than a year before trial began, Mother claimed that Father had tried to kill her. Mother testified that her attempted murder had been the last incident of domestic violence, though she later claimed that she was persuaded to make those allegations. Mother acknowledged that she had "repeatedly" reported to law enforcement that Father had been physically abusive and that there was domestic violence between her and Father. But in the same line of questioning, Mother denied any domestic violence.

Notwithstanding Mother's self-contradicting testimony, Father's criminal history shows a propensity for domestic violence, including several charges for family-violence assault and aggravated assault. When TDFPS received their initial intake involving the children, Father was being investigated for a family-violence assault against Mother. He was eventually incarcerated in February 2022 for a domestic-violence offense against Mother, which Father stated had been "bumped up" to a higher charge due to his criminal history. When questioned about this domestic-

violence charge, Father testified that the allegations were false and that he was being targeting by his and Mother's families. Specifically, Father testified that Mother had been manipulated into reporting the abuse.

In addition to Father's criminal history, Mother's and Father's prior CPS histories also reflected a trend of domestic violence. Specifically, Mother had reported that she did not feel safe with Father in the home, and she had accused Father of abuse. Despite Mother's domestic-violence denials at trial, Maloney testified that even when a domestic-violence case is ruled out by CPS, TDFPS must take such allegations into consideration when meeting with families.

## C. Evidence of Mother's and Father's Drug Use

Both Mother and Father had ongoing problems with drug use. Mother submitted to a drug test in May 2021, which resulted positive for methamphetamines and amphetamines. The results concerned TDFPS because Mother had been breastfeeding G.W. at the time. Mother submitted to another drug test in February 2022, which also returned positive for methamphetamines and amphetamines. Mother testified that her last drug use had been in December 2021, though she did not know how much she had used then or who had given it to her. She stated she did not have an excuse for why she used. The day before trial began, Mother failed to submit to a drug test that TDFPS had requested from her. Mother conceded that she had used drugs during the termination case.

TDFPS was concerned about the effects of Mother's drug use on her ability to parent the children. Specifically, a parent that abuses illegal drugs may be extremely violent or may "pass out for hours on end," leaving children to care for themselves, which is especially concerning when the children are as young as R.W. and G.W. were at the time of trial. Mother agreed with TDFPS's contentions that her drug use was unsafe for the children.

In May 2021, Father submitted to a drug test that came back positive for methamphetamines, amphetamines, and marijuana. Father reported that his last drug use had been in early 2021, which he claimed he had been forced to use by several criminal gangs that had been harassing and threatening to kill him and his family. When asked about his use of methamphetamines, Father testified that he was not a drug user but was only "partaking with the gang members who were stalking [his] family." However, Father's criminal history shows a propensity for illegal drug use beginning in 2006, including charges for possession of a controlled substance, possession of a dangerous drug, possession of marijuana, and driving while intoxicated. TDFPS was concerned about Father's drug abuse after seeing "up and down behaviors" and aggressiveness.

## D. Mother's Untreated Mental Health Issues

In addition to domestic violence and illegal drug use in the home, TDFPS had developed concerns related to Mother's mental health. Mother reported that she had been diagnosed with PTSD and bipolar disorder. She testified that she had frequent

8

panic attacks and was dealing with trauma related to being sexually assaulted as a child. Father testified that there were times in which Mother would stay awake for up to twenty hours at a time, and he described her behavior as "extremely hyperactive." Father also testified that because of Mother's PTSD, he would always take the children to paternal grandmother's house or with him when he would leave Mother. Mother had also purportedly experienced psychotic episodes.

Despite the effects of Mother's mental illnesses, she had not been following up with treatment and was refusing to take her medications. This concerned TDFPS because Mother had not been on any medication for over a year and no longer had a primary care physician.

## E. Mother's and Father's Services

Mother and Father initially received their service plans shortly after removal in June 2021. Monica Villegas, a permanency specialist with Our Community Our Kids (OCOK), was assigned to the case in September 2021. Part of Villegas's role in the case was to ensure that Mother and Father had their service plans and to help them complete their services. To ensure that they had their service plans, Villegas confirmed Mother and Father's contact information and emailed them a copy of their service plans. She then met with Mother and Father in person and provided them with a hard copy. Villegas maintained contact with Mother and Father for one to two months before losing contact with them.

Mother and Father had reported that they moved to Austin sometime in August 2021. While they were in Austin, Villegas attempted to set up their services but was unable to because Mother and Father would not provide an address or a location in Austin where they were staying. After she lost contact with Mother and Father, Villegas hired a special investigator to try to locate them. However, the special investigator was not successful. Villegas eventually found an updated phone number for Mother and Father, but not until January 2022.

Villegas testified that her contact information did not change during her involvement with the case and that there was no reason that Mother and Father would not have been able to reach her. When Villegas did occasionally hear from Mother and Father, they would ask how the children were doing, though they had not visited the children since June 2021, shortly after removal.[4] Villegas testified that she made every effort to try to get Mother and Father to engage in their services, but Mother and Father did not cooperate. Indeed, they did not even start their services until the month before trial began.

---

[4]Mother's and Father's visitations with the children were stopped in June 2021, almost immediately after removal. Villegas testified that TDFPS had received a report that Mother stole a gun from paternal grandmother's home, which had also been reported to the police. Both Mother and Father then allegedly threatened to shoot and kill everyone involved in the case. Father denied all allegations in the report. Father maintains that he is merely "a victim of bad circumstances."

### 1. Mother's Service Plan

Mother's required services were FOCUS for Mothers, Batterer's Intervention and Prevention Program (BIPP), psychosocial, psychiatric evaluation, proof of financial stability, and proof of housing stability. Villegas testified that Mother had not been engaged in her service plan, she had not addressed the concerns that brought the children into care, she was not stable and did not have a stable home environment for the children, and she had not addressed her mental health or substance abuse issues.

Mother testified that she understood that she was required to complete her services to get her children back. But the only service she completed in the almost-year between removal and trial was the psychiatric evaluation, which she had completed only the month before trial began. Mother did not enroll in FOCUS for Mothers until March 2022 for classes that would begin the week of trial, so that service was incomplete. Mother did not reach out to the BIPP provider until the week that trial began in April 2022, so that service had not been started. Although Mother had scheduled an appointment to complete her psychosocial service in March 2022, she did not show up for the appointment.

Villegas testified that Mother did not provide proof of financial stability or other evidence of employment. To the contrary, Mother had told Villegas that she was unemployed. Mother testified that she received $800 per month as disability income but did not provide a budget or otherwise explain how she planned to care for the children, or herself, financially. Mother also failed to provide proof of stable

11

housing. Rather, Mother testified that she had been homeless during the case. She had been evicted while pregnant with G.W. and then lived in hotel rooms after G.W. was born. Mother and Father had also periodically lived with paternal grandmother or stayed on friends' couches.

Villegas expressed concerns about Mother's housing and financial situation and her ability to safely care for and provide for the children. Mother testified that, were the children returned to her, she would not have a home to take them to and would not be able to provide health care, food, or transportation.

### 2. Father's Service Plan

Father's required services were FOCUS for Fathers, BIPP, psychiatric evaluation, submitting to drug testing, proof of financial stability, and proof of housing stability. Father did not complete any of his services.

Father did not enroll in FOCUS for Fathers until the month before trial began. He did not attend his first session, was late to his second session, and had just attended his third session the day before trial began. At the time of trial, Father's BIPP referral was still pending because Father had reached out to the provider only the week before trial. Although Father had scheduled his psychiatric evaluation, the date on which it was scheduled would have been after trial had concluded. Father also failed to submit to further drug testing. His service plan indicated that the failure to submit to a drug test is a presumed positive for drug use.

Father did not provide proof of financial stability. Father reported to Villegas that he was employed, but Villegas was unable to contact his purported employer to confirm his employment. And when asked about his income, Father testified that he had not received any income since May 2021. Father did not provide proof of housing stability. To the contrary, Father reported to Villegas—and testified at trial—that he was homeless. While in Austin, Mother and Father had been homeless and living on the street.

When asked how he intended to care for the children if they were returned, Father responded, "I would ask that you not do that." He stated that he needed the court's help. Father testified that without help from the state, he could not keep the children safe from the gangs he claimed were after him and his family.

## F. The Children's Foster Placement

At the time of trial, the children had been in their foster home for almost a year. Villegas testified that the children were doing very well in their foster placement, adding that they were thriving and were very active. For example, R.W. had difficulties with his speech at the time of removal that had since improved drastically.

Villegas testified that the children did not have a bond with Mother and Father and that R.W.—the only verbal child—had not asked about them. However, the children's foster family had expressed interest in adopting the children, which Villegas indicated would be in the children's best interest.

## II. Discussion

At the close of trial, the trial court terminated Mother's and Father's parental rights to the children and signed its Order of Termination. In its ruling, the trial court stated that it did not find Mother and Father to be credible witnesses.

### A. Termination under Subsections 161.001(b)(1)(D) and (E)

Mother and Father each argue that the evidence is legally and factually insufficient to support termination of their respective parental rights under Family Code Subsections 161.001(b)(1)(D) and (E). We disagree.

#### 1. Standard of Review

For a trial court to terminate a parent–child relationship, TDFPS must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest.[5] Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction

---

[5]In its termination order, the trial court found that termination of Mother's and Father's parental rights was in the best interest of the children. However, Mother and Father do not challenge the trial court's best-interest finding on appeal.

that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that TDFPS proved the specific grounds for termination under Family Code Subsections 161.001(b)(1)(D) and (E). Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

**2. Applicable Law**

Under Subsections (D) and (E), the trial court may terminate a parent's rights if it finds by clear and convincing evidence that the parent has

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under Subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* For example, "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* Illegal drug use or drug-related criminal activity by the parent "likewise supports the conclusion that the child[]'s surroundings endanger [his] physical or emotional well-being." *Id.*

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. The endangering conduct need not be directed at the child, nor must the child actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312 (citing *Boyd*, 727 S.W.2d at 533). The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *See In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."). Illegal drug use and its effect on the parent's life and her ability to parent may establish an endangering course of conduct. *Id.* Criminal activity that exposes the parent to incarceration may also endanger a child. *In re I.L.*, No. 02-18-00206-CV, 2018 WL 5668813, at *5 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

### 3. Analysis as to Mother

Here, the record reflects that the children were exposed to domestic violence in the home. Mother "repeatedly" reported to law enforcement that Father had been physically abusive and that there was domestic violence between her and Father. Notably, Mother reported to TDFPS that she did not feel safe with Father in the home. Although Mother later denied domestic violence at trial, Father's pending family-violence-assault charge and incarceration contradicted Mother's denials. Despite knowing of Father's propensity for domestic violence and even fearing for her own safety in the home, Mother allowed the children to remain in that home and failed to take any action to remove them from that environment. Additionally, Mother often allowed the children to remain under the the care of paternal grandmother and E.W., despite knowing that E.W. had a history of domestic violence, physical abuse, and sexual assault.

The record also shows that Mother failed to protect the children from physical abuse—either by placing the children in the care of a physically abusive person or by her own conduct. Mother denied any knowledge or fault related to the cause of G.W.'s fractured ribs. But the trial court heard conflicting testimony from Mother and other witnesses, and it is unclear from the record exactly how G.W. sustained his injuries. Regardless, even if Mother had not been the physical abuser herself, she likely would have been responsible for placing the children with and allowing them to remain under the care of G.W.'s physical abuser.

18

Further, Mother had problems with illegal drug use. Mother's drug test from May 2021 showed that she had been using methamphetamines and amphetamines at or near the time of removal and while she was breastfeeding G.W. After a second methamphetamine-positive drug test in February 2022, Mother admitted that her most recent drug use had been in December 2021—seven months after removal. Mother's illegal drug use affected her mental health and overall ability to parent the children. Indeed, Mother acknowledged that her drug use was unsafe for the children. And both Mother's and Father's drug use in the home likely created a dangerous environment for the children, which Mother allowed to continue when she failed to remove the children from that environment.

The record shows that Mother's untreated mental illnesses affected the safety of the children's environment. Although she had suffered from bipolar disorder and PTSD, Mother failed to consistently seek mental health treatment and refused to take any medication. Mother's untreated panic attacks, psychotic episodes, and hyperactivity likely subjected the children to uncertainty and instability in the home. Indeed, Mother's PTSD concerned Father to the point that he would take the children to paternal grandmother's house.

Mother failed to take the necessary steps to have the children returned. Mother had not been engaged in her service plan, she had not addressed the concerns that brought the children into care, she was not financially stable, and she did not provide a stable home environment for the children. In fact, Mother admitted that she did not

have a home for the children and was not capable of providing the children with health care, food, or transportation.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed R.W. and G.W. to remain in conditions or surroundings that endangered their emotional or physical well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). And we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct that endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Mother had knowingly placed or had knowingly allowed R.W. and G.W. to remain in conditions or surroundings that endangered their emotional or physical well-being and that Mother had engaged in conduct that endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). Accordingly, we overrule Mother's issues regarding termination under Subsections (D) and (E). *See id.* Because a finding of only one ground alleged under Section

20

161.001(b)(1) is sufficient to support termination, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not reach Mother's issues regarding termination under Subsections (N), (O), and (P).

**4. Analysis as to Father**

The record reflects that Father committed several acts of domestic violence in the home. Mother made numerous allegations of domestic violence against Father, including his attempt to kill Mother. Father testified that he was a felon and that his pending family-violence-assault charge had been enhanced because of his criminal history. Although Father denied the domestic-violence allegations and attempted to blame others for their origination, his criminal history demonstrates Father's propensity for domestic violence.

Additionally, Father alleged that there had been domestic violence between paternal grandmother and E.W. Despite his knowledge of the domestic violence and of E.W.'s history of physical abuse and sexual assault, Father often left the children in the care of paternal grandmother and E.W.

Like Mother, Father is likely responsible for G.W.'s rib fractures. The trial court heard conflicting testimony regarding Father's and the children's whereabouts during the two days before G.W.'s hospitalization and regarding the cause of G.W.'s injuries. Nevertheless, Father failed to protect the children when he allowed them to

be placed with and remain under the care of G.W.'s physical abuser—whether Mother, paternal grandmother, or E.W.[6]

Father had an ongoing problem with illegal drug use. Although Father was required to submit to drug testing as part of his service plan, Father submitted to only one drug test in May 2021, which resulted positive for methamphetamines, amphetamines, and marijuana. Father's failure to submit to further drug testing meant he was presumed positive. Father's illegal drug use affected his life and his ability to parent: his up-and-down behavior and aggressiveness, his extensive criminal history, and his risk of further incarceration. Additionally, Father admitted to using drugs "with the gang members who were stalking [his] family"—the same gang members that had purportedly threatened to kill Father and his family. Father's use of methamphetamines with dangerous criminal gangs is likely not conducive to a safe environment for the children.

Father failed to take the necessary steps for the return of the children. Specifically, Father did not complete any of his required services, he was not financially stable, and he did not have housing for himself or the children. Moreover, Father asked that the trial court *not* return the children to his care. He even admitted that he could not keep the children safe.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses'

---

[6]The factfinder could have made any of these attributions.

credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Father had knowingly placed or had knowingly allowed R.W. to remain in conditions or surroundings that endangered his emotional or physical well-being. *See id.* § 161.001(b)(1)(D). And we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Father had engaged in conduct that endangered R.W.'s physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had knowingly placed or had knowingly allowed R.W. to remain in conditions or surroundings that endangered his emotional or physical well-being and that Father had engaged in conduct that endangered R.W.'s physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). Accordingly, we overrule Father's issues regarding termination of his parental rights to R.W. under Subsections (D) and (E). *See id.* Because a finding of only one ground alleged under Section 161.001(b)(1) is sufficient to support termination, *A.V.*, 113 S.W.3d at 362, we need not reach Father's issues regarding termination as to R.W. under Subsections (N), (O), and (P).

**B. Termination of Father's Parental Rights to G.W. under Section 161.002**

The trial court terminated Father's parental rights to G.W. under Section 161.002(b)(1) of the Family Code. In its termination order, the trial court referred to Father as G.W.'s "alleged" father[7] and found by clear and convincing evidence that Father did not timely file an admission of paternity or file a counterclaim for paternity, pursuant to Section 161.002(b)(1) of the Family Code, and that termination was in G.W.'s best interest. Father contends that the trial court erred by terminating Father's parental rights to G.W. under Section 161.002 of the Family Code. We agree.

**1. Family Code Section 161.002(b)(1)**

Under Section 161.002(b)(1), "[t]he rights of an alleged father may be terminated if . . . after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity." Tex. Fam. Code Ann. § 161.002(b)(1). However, if the alleged father files an admission of paternity, TDFPS must then prove one of the grounds for termination under Section 161.001(b)(1) before his parental rights can be terminated. *In re J.L.A.*, No. 04-13-00857-CV, 2014 WL 1831097, at *2 (Tex. App.—San Antonio May 7, 2014, no pet.) (mem. op.); *Toliver*

[7]TDFPS did not plead that Father was G.W.'s alleged father in its original petition or request termination under Section 161.002 of the Family Code. Rather, TDFPS identified Father as "[t]he father of the children [R.W.] and [G.W.]" and requested termination pursuant to grounds listed in Section 161.001(b)(1). TDFPS never amended its petition or otherwise pled that Father was an alleged father, and nothing in the record shows that TDFPS sought termination as to G.W. based on Father's alleged paternity. In fact, the first mention in the record of Father's "alleged" paternity as to G.W. is from the trial court's temporary order following the June 1, 2021 Adversary Hearing identifying Father's appearance at the hearing.

*v. Tex. Dep't of Fam. & Protective Servs.*, 217 S.W.3d 85, 104 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *In re K.W.*, 138 S.W.3d 420, 430 (Tex. App.—Fort Worth 2004, pet. denied); *Phillips v. Tex. Dep't of Protective & Regul. Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.). If the trial court erroneously terminates an alleged father's parental rights after he sufficiently admits paternity, reversal and remand for a new trial to require TDFPS to meet its burden of proof under Section 161.001 is the appropriate remedy. *See In re E.O.*, 595 S.W.3d 858, 865 (Tex. App.—El Paso 2020, no pet.) (citing *In re C.M.C.*, 273 S.W.3d 862, 883 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (op. on reh'g)); *Phillips*, 25 S.W.3d at 357.

**2. Did Father file an admission of paternity?**

Father did not file a counterclaim for paternity. *See* Tex. Fam. Code Ann. § 161.002(b)(1). However, Father contends that he admitted paternity as to G.W.

Soon after TDFPS filed its petition, Father filed an affidavit of indigency and application for appointed counsel listing both R.W. and G.W. as his dependents and identifying himself as their father. Father then filed Respondent Father's Original Answer entering a general denial of allegations and asking the trial court to deny TDFPS's request to terminate his parental rights. At trial, Father testified that Mother was his wife and the mother of their children, that G.W. was his son, and that he loved his children—referring to "[R.W.] and [G.W.] both"—and he requested that his parental rights to his children not be terminated. Indeed, Father referred to both R.W. and G.W. as his children throughout his testimony.

Subsection 161.002(b)(1) allows the trial court to "summarily terminate" the rights of an alleged father that fails to file an admission of paternity. *Toliver*, 217 S.W.3d at 104; *Phillips*, 25 S.W.3d at 357. However, the statute does not prescribe any formalities that must be observed when "filing" an admission of paternity or for such admission to be effective. *J.L.A.*, 2014 WL 1831097, at *2 (conceding that alleged father's appearance and participation in the trial court was sufficient admission of paternity); *In re K.E.S.*, No. 02-11-00420-CV, 2012 WL 4121127, at *3 (Tex. App.—Fort Worth Sept. 20, 2012, pet. denied) (mem. op. on reh'g) (finding admission of paternity when alleged father signed his name as "Respondent Parent" and responded to a TDFPS letter acknowledging that he believed the child was his); *Toliver*, 217 S.W.3d at 105 (appearing at trial and admitting paternity triggered alleged father's right to require TDFPS to prove one of the conduct grounds under Section 161.001(b)(1) of the Family Code); *K.W.*, 138 S.W.3d at 429–30 (holding alleged father's letters to the trial court and to TDFPS stating that he was the biological father constituted admissions of paternity); *Estes v. Dall. Cnty. Child Welfare Unit of Tex. Dep't of Hum. Servs.*, 773 S.W.2d 800, 801–02 (Tex. App.—Dallas 1989, writ denied) (concluding alleged father's pro se answer alleging he was "an indigent parent" was a specific admission of paternity).

Here, although Father did not formally file a particular document admitting paternity with the trial court clerk, he filed an affidavit of indigency and application for appointed counsel identifying himself at G.W.'s father, responded to TDFPS's

petition, appeared and testified at trial prior to the court's termination of his parental rights, unequivocally asserted that he was G.W.'s father, and requested that his parental rights not be terminated. Accordingly, we hold that Father admitted paternity as to G.W. sufficient to trigger his right to require TDFPS to prove that he engaged in one of the conduct grounds listed in Section 161.001(b)(1) of the Family Code before his parental rights could be terminated. Because we conclude that Father's actions constituted admission of paternity, we hold that the trial court erred by terminating Father's parental rights to G.W. under Section 161.002(b)(1).

TDFPS argues that any error regarding the trial court's finding pursuant to Family Code Section 161.002(b) is harmless because there is "ample evidence" to terminate Father's paternal rights to both children under Section 161.001(b). But the trial court did not terminate Father's parental rights to G.W. based on one of the conduct grounds listed in Section 161.001(b)(1). Rather, the trial court erred when it summarily terminated Father's rights to G.W. pursuant to Section 161.002. Father's parental rights to G.W. were therefore terminated specifically because of the trial court's error. Accordingly, the error is harmful. *See* Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

We sustain Father's issue related to the termination of his parental rights to G.W. pursuant to Section 161.002 of the Family Code and reverse and remand for a new trial.

27

We note that Father does not challenge the trial court's appointment of TDFPS as G.W.'s permanent managing conservator. *See In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007) (concluding that a challenge to the trial court's appointment of a managing conservator is not subsumed in a parent's challenge to the trial court's termination order). Accordingly, we affirm the trial court's conservatorship appointment. *See id.* (holding that absent an independent challenge, the reversal of a termination order does not affect the trial court's conservatorship appointment when the trial court finds that appointing a parent as conservator would significantly impair the child's physical health or emotional development and that appointment of TDFPS is in the child's best interest); *In re B.C.*, No. 02-15-00175-CV, 2015 WL 6081452, at *3 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (mem. op.) (reversing the trial court's termination order but affirming the trial court's conservatorship appointment).

## C. Ineffective Assistance of Counsel Claims

In her second issue, Mother contends she was denied her right to a jury trial due to the ineffective assistance of her trial counsel in not advising Mother of her right to a jury trial and because the trial court failed to admonish Mother of her right to a jury trial.[8] Father similarly contends he received ineffective assistance of counsel because his trial counsel failed to advise Father of his right to a jury trial or request a jury trial on Father's behalf.

---

[8]Although Mother summarily contends that the trial court erred by failing to admonish her regarding her right to a jury trial, Mother does not brief or otherwise argue the issue.

28

**1. Standard of Review and Applicable Law**

Parents have the right to effective assistance of counsel in termination cases. *J.O.A.*, 283 S.W.3d at 341, 343; *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). A parent who responds in opposition to a government-initiated parental-rights-termination suit may assert a claim for ineffective assistance of counsel. *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021). We analyze the effectiveness of counsel in parental-rights-termination cases under the same two-prong test utilized in the criminal context. *See Strickland v. Washington*, 466 U.S. 668, 688–93, 104 S. Ct. 2052, 2064–68 (1984); *M.S.*, 115 S.W.3d at 545. Under *Strickland*, an appellant must prove by a preponderance of the evidence that (1) his or her counsel's representation was deficient and (2) the deficiency prejudiced his or her defense. 466 U.S. at 687, 104 S. Ct. at 2064; *M.S.*, 115 S.W.3d at 545.

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *M.S.*, 115 S.W.3d at 545. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *M.S.*, 115 S.W.3d at 545.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069.

## 2. Analysis as to Mother

Lacy Kimball was appointed to represent Mother. Mother argues that she did not know she was entitled to a jury trial and that Kimball never discussed the option of a jury trial. Mother's brief does not allege error on the part of the trial court but specifically presents the issue as "whether [Kimball's] performance was deficient in not addressing this constitutionally fundamental right with her client." She then analyzes the two-prong test set forth in *Strickland*. Without deciding whether Kimball's performance was deficient,[9] we will hold that Mother has failed to show that she was prejudiced by Kimball's actions. *See id.* at 694, 104 S. Ct. at 2068.

---

[9]We need not address both prongs of the *Strickland* test if the appellant makes an insufficient showing on one component, nor must we address them in any particular order. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

Implicitly addressing how she was prejudiced by Kimball's alleged failure to inform Mother of her right to a jury trial, Mother vaguely asserts that "[a] denial of that right is a very serious matter." *See Bell Helicopter Textron v. Abbott*, 863 S.W.2d 139, 141 (Tex. App.—Texarkana 1993, writ denied). Mother conflates portions of the record to suggest that the trial court was biased against her after learning of threats of violence involving firearms that posed a risk of harm to the judiciary—though Mother was not present when the alleged threats were made and only heard about them later. Mother also highlights obscure statements in the record—that the trial court made in a relevancy context—to suggest prejudice.

In the context of the waiver of a jury proceeding, the proper measure of prejudice for an attorney's deficient performance is "whether there is a reasonable likelihood that the defendant would have opted for the proceeding if his attorney had performed adequately." *Miller v. State*, 548 S.W.3d 497, 502 (Tex. Crim. App. 2018) (op. on reh'g) (citing *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017)). Here, then, we must determine whether Mother has shown that a reasonable likelihood existed that she would have requested a jury trial had Kimball timely informed her of her right to elect one. Mother herself never testified that she would have requested a jury trial. At the hearing on her motion for new trial, Mother stated that she had only recently developed concerns regarding the court systems, the judge, and "things like that" but that she did not feel any of those concerns at any time previously in the case. And it

31

was not until "[h]ere recently" that Mother became concerned about alleged bias in the court system in Parker County. Thus, our analysis turns on other record evidence.

To the extent that Mother complains of Kimball's failure to communicate to Mother that she had a right to a jury trial, Mother was "out of pocket" and did not have access to a phone; thus, she made herself unavailable to Kimball while Mother and Father were in Austin. Mother also testified that she had notified only her family and the caseworker supervisor that she was moving to Austin.

Additionally, Mother refused to be by G.W.'s side while he was in the hospital with fractured ribs, refused to leave Father after reporting that he had committed several acts of domestic violence against Mother, tested positive for using methamphetamines on two drug tests in May 2021 and February 2022, failed to submit to further drug testing before trial, refused to follow up with her mental health treatment, refused to take any medication for her mental illnesses, did not complete her required services, and did not obtain financial stability or stable housing.

Given Mother's lack of engagement in the case, we are not persuaded that it was reasonably likely that Mother would have requested a jury trial even had Kimball timely informed her of the existence of that right. *See In re L.H.*, No. 02-21-00260-CV, 2022 WL 246868, at *6 (Tex. App.—Fort Worth Jan. 27, 2022, no pet.) (mem. op.) (citing *Miller v. State*, No. 05-14-01065-CR, 2018 WL 4579788, at *3 (Tex. App.— Dallas Sept. 25, 2018, pet. denied) (mem. op., not designated for publication)). Accordingly, we overrule Mother's issue regarding ineffective assistance of counsel.

### 3. Analysis as to Father

Kathleen Wise was appointed to represent Father. Father asserts that he was not aware of his right to a jury trial, that Wise did not discuss his right to a jury trial with him until after the trial, that he was prejudiced by Wise's deficiency, and that he would have requested a jury trial but for his lack of knowledge. TDFPS argues that the entire record shows that Wise's assistance of counsel was effective and that Father has not shown how having a jury trial would have resulted in a different outcome.

Before trial began, Wise filed a motion to withdraw asserting that Father's conduct had rendered counsel unable to communicate with him in a manner conducive to good attorney–client relations. At the motion for new trial hearing, Father testified that he had met with Wise three times in person and two to four times by phone. Father alleged that Wise never "properly sat down" and explained to him his right to a jury trial. Wise, however, testified that on May 28, 2021, specifically, she described to Father his right to a jury trial during a phone conversation with him. According to Wise, Father was unresponsive to communications, he did not show up for the first hearing, and he refused to attend an in-person meeting at the commencement of the case. Wise also testified that she had had multiple phone conversations with Father at the commencement of the case but that he then stopped communicating with her, and she did not hear from him again until she visited him in jail while he was incarcerated in February 2022.

At the beginning of trial, Father explained that he and Wise had not "been in the best contact" but that the communication issues were not "all on [Wise's] part." The trial court then gave Father the option to either agree with Wise that she remain on his case or to have Wise appointed as a stand-by attorney. He requested that Wise continue to represent him, which she did. Father later declared that he had no complaints about Wise's representation, "not whatsoever."

Reviewing the totality of the representation and the particular circumstances of the case, we hold that Wise provided reasonable assistance under all the circumstances and prevailing professional norms. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. The record reflects that throughout trial, Wise zealously advocated on Father's behalf. She made numerous objections and provided the trial court with legal arguments. Additionally, Wise cross-examined TDFPS's witnesses, raised questions about their evidence, and pleaded Father's case in closing arguments. Wise's representation was therefore not deficient. Because Father made an insufficient showing on the deficient-performance prong, we need not address the prejudice prong. *See id.* at 697, 104 S. Ct. at 2069. Accordingly, we overrule Father's issue regarding ineffective assistance of counsel.

## D. Admission of Evidence of Father's Drug Test Results

Father argues that the trial court erred by admitting evidence of Father's purported drug test results because the witness did not have the requisite training,

34

education, experience, skill, or knowledge in a field that would qualify her to interpret and convey the purported drug testing results.

Whether to admit or exclude evidence is within the trial court's sound discretion. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g). While Father cites to general authority applicable to testimony by purported experts, *see Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996), he cites no authority that requires expert testimony to interpret or explain drug test results in parental termination cases. Nevertheless, without deciding whether the trial court abused its discretion, we hold that any error in admitting the testimony was harmless.

### 1. Harmless Error

We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably, though not necessarily, caused the rendition of an improper judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012). The complaining party must usually show that the whole case turned on the evidence at issue. *Interstate Northborough P'ship*, 66 S.W.3d at 220. Thus, an erroneous admission of evidence is harmless if it is merely cumulative. *In re K.R.G.*, No. 02-12-00384-CV, 2013 WL 3179498, at *3 (Tex. App.—Fort Worth Mar. 21, 2013, pets. denied) (mem. op.) (citing *In re C.R.*, 263 S.W.3d 368, 370–71 (Tex. App.—Dallas 2008, no pet.)).

**2. Analysis**

Maloney testified that Father's drug test in May 2021 resulted positive for methamphetamines, amphetamines, and marijuana. Other evidence in the record shows that Father himself admitted at trial that he had tested positive for methamphetamine and marijuana on a drug test at the beginning of the case, that his last drug use prior to that drug test would have been anywhere from one week to one month prior, and that he had ingested those drugs sometime before the drug test in May 2021. Additionally, Villegas testified—without any objection from Father—that Father had reported to TDFPS that the last time he used drugs was in early 2021.

The complained-of testimony is cumulative of evidence in the record that supported Father's drug use in or before May 2021. Therefore, any error in the admission of this evidence was harmless. *See C.R.*, 263 S.W.3d at 370–71 (overruling appellant's complaint about the admission of her drug test results when there was extensive other evidence that appellant used illegal drugs such that the drug test results were cumulative, rendering the error, if any, harmless). Accordingly, we overrule Father's issue regarding the admission of evidence of Father's drug test results.

**E. Denial of Mother's Motion for Extension**

Mother contends that the trial court erred by denying her Motion to Extend. TDFPS argues that the trial court did not abuse its discretion by denying the continuance because Mother, through her own choices, failed to comply with her service plan.

**1. Standard of Review and Applicable Law**

Section 263.401 of the Family Code provides a one-year dismissal deadline for a suit affecting the parent–child relationship filed by TDFPS that requests termination. Tex. Fam. Code Ann. § 263.401(a). However, if the trial court finds that "extraordinary circumstances" necessitate the child remaining in the temporary managing conservatorship of TDFPS and that continuing the appointment of TDFPS as temporary managing conservator is in the best interest of the child, the trial court may retain the suit on the court's docket for up to 180 days. *Id.* § 263.401(b). The focus in granting or denying an extension of the statutory dismissal date is on the needs of the child—not of the parent. *In re D.R.*, 631 S.W.3d 826, 836 (Tex. App.—Texarkana 2021, no pet.); *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (en banc op. on reh'g).

We review the denial of a motion to extend the dismissal date under an abuse of discretion standard. *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth), *pet. denied*, 260 S.W.3d 462 (Tex. 2008). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But no abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

## 2. Analysis

Mother filed her motion for extension requesting more time to complete her services and requesting additional time for TDFPS to review a recent possible kinship placement with her brother. To explain why she had not completed her services, Mother testified that she had experienced a lot of trauma related to domestic violence and to a recent sexual assault by E.W., which had inhibited her ability to start her services sooner. On appeal, Mother recognizes that this may not rise to the level of extraordinary circumstances. Regardless, Mother argues that TDFPS's failure to fulfill its statutory duty related to seeking kinship placement prior to trial does constitute extraordinary circumstances. We hold that the trial court did not abuse its discretion.

The trial court heard testimony that Mother's own choices led to her failure to comply with her required service plan. Actions that are considered to be the parents' fault will generally not constitute extraordinary circumstances, such as the failure to comply with a service plan. *In re M.K.V.*, 648 S.W.3d 478, 483 (Tex. App.—San Antonio 2021, no pet.); *D.R.*, 631 S.W.3d at 837; *In re J.S.S.*, 594 S.W.3d 493, 501

38

(Tex. App.—Waco 2019, pet. denied) (mem. op.). We therefore cannot say that the trial court abused its discretion by failing to find extraordinary circumstances under these facts.

Likewise, we cannot say that the trial court abused its discretion by failing to find that the recently identified possible kinship placement constituted extraordinary circumstances. Mother argues that the one-year deadline imposed on a parent in Family Code Section 263.401(b)—to be fully prepared for trial—should be equally imposed on TDFPS to seek possible kinship placement. However, Mother provides no authority, and we have found none, that supports Mother's argument or otherwise suggests that TDFPS has a statutorily imposed duty to make a kinship placement before proceeding to trial.[10]

At trial, Villegas testified that TDFPS would continue looking into possible kinship placement for the children even after termination. However, the determination of where a child will be placed is a factor in evaluating the child's best interest. *In re C.C.*, No. 2-04-206-CV, 2005 WL 1244672, at *6–7 (Tex. App.—Fort Worth May 26, 2005, no pet.) (per curiam) (mem. op.). It is not a bar to termination proceedings that placement plans are not final. *See id.* Indeed, "a trial court does not abuse its discretion in determining that it would be against the children's best interest

---

[10]The authority Mother does cite is not applicable because, unlike the potential issue addressed by the Texas Supreme Court, our record contains no evidence that TDFPS had dismissed Mother's brother or any other possible kinship placement options. *See In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022).

to delay the suit to evaluate a relative, risking dismissal of the case." *In re G.B. II*, 357 S.W.3d 382, 384 (Tex. App.—Waco 2011, no pet.) (citing *In re Northrop*, 305 S.W.3d 172, 177–78 (Tex. App.—Houston [1st Dist.] 2009, orig. proceeding) (op. on reh'g); *C.C.*, 2005 WL 1244672, at *6–7).

Accordingly, we hold that the trial court did not abuse its discretion by denying Mother's motion for extension. We overrule Mother's issue regarding the denial of her motion for extension.

## III. Conclusion

Having overruled Mother's and Father's respective issues related to termination under Family Code Section 161.001(b), Mother's and Father's respective issues related to ineffective assistance of counsel, Father's evidentiary issue, and Mother's issue related to her motion for extension, we affirm that portion of the judgment terminating Mother's parental rights as to R.W. and G.W. and terminating Father's parental rights as to R.W. However, we reverse that portion of the judgment terminating Father's parental rights to G.W. and remand the cause to the trial court for a new trial related to Father's rights to G.W., and we affirm the trial court's conservatorship appointment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: October 18, 2022